# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

HENRY STANLEY,

    Plaintiff,

vs.

COLLEEN F. ARNOLD, *et al.*,

    Defendants.

Case No. 1:12-cv-482

Judge Timothy S. Black

## ORDER GRANTING THE CARDINAL HEALTH DEFENDANTS' MOTION TO DISMISS

This civil action is before the Court on the Cardinal Health Defendants'[1] motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 23.1 (Doc. 7), and the parties' responsive memoranda (Docs. 13, 16).[2] Specifically, the Cardinal Health Defendants maintain that Plaintiff lacks standing because he failed to make a pre-suit demand on its Board of Directors as required by Rule 23.1.

### I. BACKGROUND FACTS AS ALLEGED BY THE PLAINTIFF

The U.S. Drug Enforcement Agency ("DEA") issued Immediate Suspension Orders ("ISOs") with respect to the Company's Auburn, Washington drug distribution

---

[1] The Cardinal Health Defendants are nominal defendant Cardinal Health, Inc. ("the Company") and individual director defendants Colleen F. Arnold, George S. Barrett, Glenn A. Britt, Carrie S. Cox, Calvin Darden, Bruce L. Downey, John F. Finn, Gregory B. Kenny, David P. King, Richard C. Notebaert, David W. Raisbeck, Jean G. Spaulding, M.D., Dave Bing, R. Kerry Clark, George H. Conrades, Philip L. Francis, John F. Havens, J. Michael Losh, John B. McCoy, Michael D. O'Halleran, Matthew D. Walter, and Robert D. Walter.

[2] At the parties' request (*See* Docs. 7, 13, 16), this civil action came on before the Court for oral argument on October 9, 2012.

facility on November 28, 2007 (Doc. 1 at ¶ 46); Lakeland Facility, Florida on December 5, 2007 (the "2007 ISO") (*Id*. at ¶ 48);[3] and Swedesboro, New Jersey drug distribution facility on December 7, 2007 (*Id*. at ¶ 54). All three ISOs were based upon the improper diversion of large quantities of hydrocodone, a controlled substance, for improper purposes. (*Id*. at ¶¶ 46, 49-52, 54). In addition, on January 30, 2008, the DEA issued an Order to Show Cause that provided Cardinal Health[4] an opportunity to show cause as to why it should not revoke the Certificate of Registration assigned to the Company's Stafford, Texas drug distribution center for the improper distribution of hydrocodone. (*Id*. at ¶¶ 56-57).

---

[3] According to the 2007 ISO, the Company distributed hydrocodone to various pharmacies, even though it knew that many of the orders placed by those pharmacies were of an unusual size and were "suspicious" as defined in 21 C.F.R. § 1301.74(b). (Doc. 1 at ¶ 50). The 2007 ISO stated that the Company repeatedly supplied the pharmacies "with excessive amounts of hydrocodone despite the substantial guidance provided to [the Company] by DEA regarding identifying rogue pharmacies engaged in Internet diversion schemes, and despite the public information readily available to [the Company] regarding many of its pharmacy customers' association with rogue Internet pharmacy websites, and despite the suspicious nature of the orders placed by these pharmacies." *Id.* For example, the Company distributed 1,213,200 dosage units to United Prescription Services, Inc. from July to October 2006. (*Id.* at ¶ 51). The 2007 ISO further detailed that on September 1, 2006, Eric Brantley, Manager of Quality and Regulatory Affairs for Cardinal Health, sent an email to the DEA's E-Commerce Section, stating that Cardinal Health discontinued its sales of controlled substances to thirteen Internet pharmacies, including RKR Holdings, Inc. ("RKR Holdings"). Nevertheless, from September 1, 2006, to January 31, 2007, Cardinal Health distributed 393,600 dosage units of combination hydrocodone products to RKR Holdings. (*Id.* at ¶ 52).

[4] Cardinal Health is an Ohio corporation headquartered in Dublin, Ohio. (Doc. 1 at ¶¶ 1, 14). It is one of the largest wholesale pharmaceutical distributors in the United States. (*Id.* at ¶¶ 2, 42).

Following the three ISOs and the Order to Show Cause, the DEA and Cardinal Health entered into the Memorandum of Agreement ("MOA") on September 29, 2008, which was signed on behalf of the Company by Individual Defendant R. Kerry Clark, its former Chairman and Chief Executive Officer. (Doc. 1 at ¶¶ 5, 65). The MOA discussed the three ISOs and the Order to Show Cause, as well as the DEA's allegations that "Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities" located in McDonough, Georgia, Valencia, California, and Denver, Colorado. (*Id.* at ¶ 60).

Pursuant to the MOA, Cardinal Health agreed to, among other things, "maintain a compliance program designed to detect and prevent diversion of controlled substances as required under the CSA and applicable DEA regulations." (Doc. 1 at ¶ 61). The MOA detailed additional obligations for Cardinal Health, including, *inter alia*, that "[o]n a monthly basis, Cardinal shall provide DEA Headquarters with a report of all sales transactions of controlled substances, carisoprodol, and tramadol," and "Cardinal shall inform DEA of suspicious orders as required by 21 C.F.R. § 1301.74(b)." (*Id.* at ¶ 62).

Under the MOA, Cardinal Health agreed to pay, pursuant to 21 U.S.C. § 842(c), a civil fine of $34 million for violations of 21 U.S.C. § 842(a)(5), to settle claims for civil penalties for failing to report suspicious orders of controlled substances. (Doc. 1 at ¶ 64). Of the total amount of the penalty, nearly half, $16 million, was attributable to the Company's conduct at the Lakeland Facility in Florida. (*Id.* at ¶ 67).

The 2007 ISO was lifted on October 2, 2008. (Doc. 1 at ¶ 71). Nonetheless, Cardinal Health almost immediately began violating the Controlled Substances Act ("CSA") and the MOA. (*Id*.) The DEA investigated the Lakeland Facility's distribution of oxycodone between November 2008 and December 2011 to its top four Florida retail customers: (i) Holiday CVS, L.L.C., CVS # 00219 in Sanford ("CVS 219"); (ii) Holiday CVS, L.L.C., CVS # 05195 in Sanford ("CVS 5195"); (iii) Caremed Health Corporation, Brooks Pharmacy in Bonita Springs ("Caremed"); and (iv) Gulf Coast Pharmacy in Fort Myers ("Gulf Coast"). (*Id*. at ¶ 72; *see also* ¶¶ 73-75).

The DEA found that "the investigation at Cardinal Lakeland revealed a persistent failure to exercise due diligence to ensure that controlled substances were not being diverted," and that "over a period of approximately 3 years, November 2008 to December 2011, Cardinal's anti-diversion controls were inadequate to meet their due diligence responsibilities." (Doc. 1 at ¶ 76). The DEA attributed these failures to "evidence that Cardinal's due diligence practices were inconsistent with both the 2008 MOA and Cardinal's own policies the purpose of which was to reduce diversion." *Id*. This resulted in the four Florida retailers described above being supplied with approximately fifty times the amount of oxycodone compared to the average Florida retailer that Cardinal Health services. (*Id.; See also* ¶¶ 77-93).

The DEA investigation culminated in the issuance of the 2012 ISO regarding the Lakeland Facility. (Doc. 1 at ¶ 85). The 2012 ISO stated that "[d]espite the MOA, the

specific guidance provided to Cardinal by DEA, and despite the public information readily available regarding the oxycodone epidemic in Florida, Cardinal has failed to maintain effective controls against the diversion of controlled substances into other than legitimate medical, scientific, and industrial channels, in violation of 21 U.S.C. §§ 823(b)(1) and (e)(1)." *Id.* It also found that "[n]otwithstanding the large quantities of controlled substances ordered by Cardinal's top retail pharmacy customers, Cardinal failed to conduct meaningful due diligence to ensure that the controlled substances were not diverted into other than legitimate channels, including Cardinal's failure to conduct due diligence of its retail pharmacy chain customers." (*Id.* at ¶ 88). The 2012 ISO continued: "Cardinal failed to detect and report suspicious orders of oxycodone products by its pharmacy customers, as required by 21 C.F.R. § 1301.74(b). In addition, Cardinal's conduct described herein violated the provisions of the Administrative Memorandum of Agreement." (*Id.*)

On February 3, 2012, Cardinal Health filed a complaint and an application for a temporary restraining order ("TRO") with respect to the 2012 ISO. *Cardinal Health, Inc. v. Holder*, Case No. 1:12CV185 (D.D.C. 2012). (Doc. 1 at ¶ 94). After a hearing on February 3, 2012, at which counsel for the government was not present, the Court granted Cardinal Health's request for a TRO. (*Id.*) Cardinal Health subsequently filed a Motion for Preliminary Injunction on February 6, 2012, which the Court denied on February 29, 2012. (*Id.*) The Company filed a notice of appeal on February 29, 2012, and filed an

emergency motion for injunction pending appeal on March 2, 2012, which was denied on March 16, 2012.  (*Id.*)

On May 15, 2012, Cardinal Health announced that it agreed to a settlement with the DEA to resolve the ongoing litigation with respect to the 2012 ISO.  (Doc. 1 at ¶ 95). Pursuant to the settlement (the "Settlement"), Cardinal Health agreed to a two-year suspension of the Lakeland Facility's DEA registration to ship controlled medicines from the facility.  (*Id.*)  Cardinal Health also agreed, as it did in 2008, to improve its anti-diversion procedures.  (*Id.*)  The Company admitted in the Stipulation and Agreement that "its due diligence efforts for some pharmacy customers and its compliance with the 2008 MOA, in certain respects, were inadequate."

On June 26, 2012, the Attorney General for West Virginia filed a complaint against the Company based upon the 2012 ISO.  *West Virginia ex rel. McGraw v. Cardinal Health, Inc.*, C.A. No. 12-C-140 (W. Va. Boone Cnty. Cir. Ct.).  The suit seeks to recover the costs caused by the prescription painkiller abuse epidemic fueled by Cardinal Health's supply in West Virginia of "controlled substances to rogue drugstores which dispense controlled substances based on bogus prescriptions from unethical physicians who are prescribing controlled substances for illegitimate medical purposes." The complaint discussed the 2012 ISO and the ensuing litigation at length, and accused Cardinal Health of being a "pill mill."

Plaintiff, who owns Cardinal Health shares (Doc. 1 at ¶¶ 13, 110), brings this civil action, alleging that the individual defendants, who include all of Cardinal Health's current directors, breached their fiduciary duties to the company by failing to ensure its compliance with DEA regulations on controlled substances. (*Id.* at ¶¶ 129-136).[5]

## II.   ANALYSIS

### A.   Pre-Suit Demand

Defendants maintain that Plaintiff lacks standing because he failed to meet a condition precedent to any shareholder derivative suit – making a pre-suit demand on the board of directors.

The plaintiff in a shareholder derivative action must either make a pre-suit demand on the board of directors for the desired action or "state with particularity" the reasons for failing to make such a demand. Fed. R. Civ. P. 23.1(b)(3). "If Plaintiffs do not comply with the requirements of Rule 23.1, they do not have standing to bring suit." *In re Ferro Corp. Deriv. Litig. ("Ferro II")*, 511 F.3d 611, 617 (6th Cir. 2008).[6] Like the federal rules, Ohio's Rules of Civil Procedure contain a requirement that the complaint "allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires

---

[5] Cardinal Health's Board had twelve members at the time the complaint was filed. (Doc. 1 at ¶¶ 15-26). Only one Board member is a Cardinal Health employee, and the other eleven are independent, outside directors. (*Id.* at ¶ 16).

[6] The adequacy of demand required by Rule 23.1 is determined under the law of the corporation's state of incorporation, which is, in this case, Ohio. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 109 n.10 (1991).

from the directors and, if necessary, from the shareholders and the reasons for his failure to obtain the action or for not making the effort." Ohio Civ. R. 23.1. The Sixth Circuit routinely dismisses complaints where the plaintiff does not satisfy the demand requirement. *Ferro II,* 511 F.3d at 623 (affirming dismissal for lack of pre-suit demand under Ohio law).[7]

In this case, the parties do not dispute that Plaintiff failed to make a pre-suit demand, and the only relevant question is whether Plaintiff's failure to seek demand is properly excused under Ohio law.

Ohio law permits a shareholder to proceed with a derivative suit without first making a demand if the shareholder can demonstrate that the demand would have been futile. *Carlson v. Rabkin,* 789 N.E.2d 1122, 1128 (Ohio App. 2003). To demonstrate futility, Plaintiff bears the burden of showing that "the directors' minds are closed to argument and that they cannot properly exercise their business judgment in determining whether the suit should be filed." *Id.*[8]

---

[7] *See also Monday v. Meyer*, No. 1:10cv1838, 2011 U.S. Dist. LEXIS 136858, at *8 (N.D. Ohio Nov. 29, 2011) (dismissing derivative complaint where demand futility was not shown under Ohio law).

[8] Establishing futility is "not an easy task" because "Ohio law embraces the presumption that directors can make an unbiased, independent business judgment about whether it would be in the corporation's best interests to sue some or all of the other directors." *In re Ferro Corp. Derivative Litig. ("Ferro I"),* No. 1:04cv1626, 2006 U.S. Dist. LEXIS 11608, at *4-5 (E.D. Ohio Mar. 21, 2006).

Plaintiff may not simply allege futility, but rather must "point to facts which show that the presumed ability of the directors to make unbiased, independent business judgments about whether it would be in the corporation's best interests to file the action does not exist in this case." *Ferro II*, 511 F.3d at 618. Moreover, Ohio law "presumes" that directors can exercise their independent business judgment about whether it would be in the best interests of the corporation to sue some or all of the other directors, and Ohio courts "have consistently rejected the idea that demand is always futile when the directors are targeted as the wrongdoers of the suit the shareholders wish the corporation to bring." *Id.* (citing *Drage v. Procter & Gamble*, 694 N.E.2d 479, 483 (Ohio App. 1997)). However, demand is presumptively futile "where the directors are antagonistic, adversely interested, or involved in the transactions attacked." *Ferro II*, 511 F.3d at 618 (citing *Bonacci v. Ohio Highway Express, Inc.*, No. 60825, 1992 Ohio App. LEXIS 3940 at *4 (Ohio App. July 30, 1992)).

Plaintiff maintains that he has alleged more than sufficient facts to create reasonable doubt as to the lack of disinterest on the part of a majority of the Director Defendants. Reasonable doubt as to the disinterestedness of a director is created when the particularized allegations in the complaint present "a substantial likelihood" of liability on the part of a director. *Rales v. Blasband*, 634 A.2d 927, 936 (De. 1993).[9]

---

[9] "Ohio courts routinely look to Delaware case law for guidance in deciding corporate law issues generally, and demand futility issues specifically." *In re Keithley Instruments, Inc.*, 599 F. Supp. 2d 908, 918, n. 6 (N.D. Ohio 2009) (applying Ohio law to decide whether demand on board of Ohio corporation was excused and treating Delaware law as "highly persuasive").

Specifically, Plaintiff alleges that: (1) Cardinal entered into the MOA with the DEA in September 2008 because of its lax compliance with applicable legal requirements concerning the distribution and sale of controlled substances, particularly at the Lakeland Facility; and (2) Cardinal agreed in the MOA to enhance its internal controls and institute a compliance program to detect and prevent the diversion of controlled substances, particularly prescription painkillers; (3) Cardinal agreed to pay a $34 million civil fine for its past transgressions, the bulk of the fine for conduct that occurred at the Lakeland Facility; and (4) Cardinal started selling oxycodone pills in enormous quantities to four pharmacies in Florida in violation of the CSA, its implementing regulations, and the MOA, shortly after it was signed.

Plaintiff claims that the recidivist activities at Cardinal Health would not have happened if the Director Defendants had taken the "red flag" warnings seriously and implemented and exercised oversight of effective internal controls and an adequate compliance program. Plaintiff maintains that their failure to do so makes them antagonistic to and adversely interested in the present action, rendering demand futile.

### B. Futility

#### 1. *Whether half the Board is substantially likely to be personally liable*

Plaintiff argues that this is a case of director liability based on a knowing and conscious failure to ensure compliance with the CSA, regulations, and the Company's internal controls.

Where a complaint challenges board inaction, such as in this case, an alleged shortfall in monitoring management's efforts at compliance with federal regulations, absent pre-suit demand, the case can proceed only if the "particularized allegations in the complaint present 'a substantial likelihood' of liability" for a majority of the board, and not simply the "mere threat of personal liability." *In re Keithley Instruments, Inc.,* (*"Keithley I"*), 599 F. Supp. 2d 875, 890 (N.D. Ohio 2008). And under Ohio law, directors are personally liable to their company only where their conduct is disloyal – *i.e.*, action or inaction undertaken "with deliberate intent to cause injury to the corporation" or "with reckless disregard for the best interests of the corporation" – and then only if that misconduct is proved by "clear and convincing evidence." Ohio Rev. Code § 1701.59(E).

Therefore, to demonstrate demand futility, the complaint must have particularized factual allegations showing that at least half of the current board, six of the twelve directors, is "substantially likely" to be held personally liable under Section 1701.59(E).

Plaintiff argues that at least half the Board is substantially likely to be personally liable because they "knowingly and consciously presided over the Company's systematic violations" of federal regulations. (Doc. 13 at 16). Specifically, Plaintiff alleges that the Board knew the Company's internal controls and compliance program regarding controlled substances were severely lacking due to the existence of the MOA, ISOs, and Order to Show Cause. (Doc. 1 at ¶ 116). Despite the fact that the Board was given a second chance to correct its failures to implement and oversee the Company's

compliance, the Board failed again, which Plaintiff maintains is evidence that the Director Defendants "knowingly and consciously presided over the Company's systematic violations of the CSA and other applicable regulations." (*Id.* at ¶ 118).[10] Additionally, Plaintiff claims that actions at the Lakeland Facility, such as failing to follow suspicious order monitoring policies, failing to conduct site visits for retail chain pharmacy customers, and low or non-existent reporting of suspicious orders to the DEA, lend further support to his argument. (*Id*. at ¶¶ 77-93).

However, the complaint lacks any allegations demonstrating that the Board knew about these alleged red flags. The complaint does not allege that the Board received any information between the 2008 MOA and the 2012 ISO that notified it about any compliance issues. "Directors will be potentially liable for breach of their oversight duty only if they ignore 'red flags' that actually come to their attention, warning of compliance problems." *Forsythe*, 2006 Del. Ch. LEXIS 60 at 7. Alleging the "presence" of supposed red flags, and asserting that the Board "had to be aware of the red flags" (Doc. 13 at 16), cannot serve as a basis for liability. Mere allegations that "the individual Defendants knew about the alleged wrongdoings because they were directors and did 'director-type' things . . . would circumvent the demand requirement in almost any derivative suit and are simply insufficient under Ohio law" to show that directors could

---

[10] Plaintiff maintains that all of the Director Defendants were members of the Board for all or part of the time the Company supplied the four Florida pharmacies with enormous quantities of oxycodone pills, and the majority were Board members when the MOA was signed and thus were aware of the red flags. (Doc. 1 at ¶ 115).

-12-

not objectively hear a demand. *Ferro I*, 2006 U.S. Dist. LEXIS 11608 at 6.*[11]*

Plaintiff further alleges that the Board had knowledge of the "red flags" because some of the current directors served on the Audit and/or Governance Committees. (Doc. 1 at ¶¶ 122-124; 125-126). However, "Courts repeatedly reject allegations of membership on committees, and recitation of the roles of the committees, as establishing a likelihood of liability." *Monday v. Meyer*, No. 1:10cv1838, 2011 U.S. Dist. LEXIS 136858, at *7 (N.D. Ohio Nov. 29, 2011).[12] "[H]ighly generalized" committee membership allegations of the sort made here "fail to allege in any detail what each individual committee member did or did not do to supposedly breach his or her duties." *In re Goodyear Tire & Rubber Co. Derivitive Litig.*, 5:03cv2180, 2007 U.S. Dist. LEXIS

---

[11] *See, e.g., Monday*, 2011 U.S. Dist. LEXIS 136868 (holding that the complaint relied on the structure of defendant's corporate governance to show that the individual defendants must have known that their actions were not valid exercises of business judgment, which fails to meet the high standard of pleading demand futility); *In re Intel Deriv. Litig.*, 621 F. Supp. at 174 (dismissing complaint where "Plaintiff identifies a number of so-called 'red flags' [but] fails to identify what the Directors actually knew about the 'red flags' and how they responded to them").

[12] *Id.* at 21-22 ("It is insufficient to allege that, because Defendants were members of certain committees, and because of the defined roles of those committees, Defendants automatically knew or should have known about the falsity of financial statements, inflated compensations [etc.], . . . In order to allege futility based on a director's committee membership, the Complaint would have to show some specific report or piece of information that the committee was given which would have tipped them off to misconduct.").

1233, at *4-5 (N.D. Ohio Jan. 5, 2007).[13]  In short, "[m]issing from the complaint are any particularized facts that link a majority of the directors to any concerted board action." *In re Xcel Energy, Inc.*, 222 F.R.D. 603, 607 (D. Minn. 2004).[14]  Moreover "bald charges of mere failure to take corrective action are . . . inadequate to demonstrate futility." *Ferro II*, 511 F.3d at 621 (*citing Lewis v. Graves*, 701 F.2d 245, 249 (2d Cir. 1983)).

Here, while Plaintiff alleges specific facts stating that certain Cardinal Health *employees* acted with conscious disregard to compliance with the CSA, regulation, and the Company's internal controls, Plaintiff fails to plead specific facts stating that the *Director Defendants* acted with conscious disregard with respect to the same.[15]

Additionally, Plaintiff's argument that if there was a regulatory violation, then *ipso facto*, the Board must have breached its fiduciary duties is improper.  "[C]ourts routinely

---

[13] Plaintiff also alleges that demand is excused because all the directors are named as defendants. (Doc. 13 at 15).  However, "courts have consistently rejected the idea that demand is always futile when the directors are targeted as the wrongdoers in the suit the shareholders wish the corporation to bring; that is, a bare allegation that the directors would not want to sue themselves or each other does not show that demand would be futile." *Drage*, 694 N.E.2d at 483.  Plaintiff further argues that demand is excused because of a recently filed action that refers to the 2012 ISO. *See West Virginia v. Cardinal Health, Inc.*, No. 12-C-140 (Boone Cty. W. Va. June 26, 2012.  However, the mere existence of another lawsuit, which contains unproven allegations, cannot give rise to a substantial likelihood of liability in this lawsuit.  Moreover, because the West Virginia lawsuit was filed after Plaintiffs (both Stanley and Kleid) filed their lawsuits, it is "not relevant to the equation of precomplaint futility." *Drage*, 694 N.E.2d at 484.

[14] *Cf. NECA-IBEW Pension Fund v. Cox*, No. 1:11cv451, 2011 U.S. Dist. LEXIS 106161, at *8-9 (S.D. Ohio Sept. 20, 2011) (J. Black).

[15] *See also Davis v. DCB Fin. Corp.*, 259 F. Supp. 2d 664, 671 (S.D. Ohio 2003) (demand not excused where plaintiff did "not identify what role, if any, that the individual board members had in the [misconduct]").

reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so." *Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007).[16] The law does not presume that the directors of a large organization like Cardinal Health are aware of every action by every employee or every sale to every customer. *See, e.g., In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 971 ( Del. Ch. 1996) ("[O]f course, the duty to act in good faith to be informed cannot be thought to require directors to posses detailed information about all aspects of the operation of the enterprise. Such a requirement would simply be inconsistent with the scale and scope of efficient organization size in this technological age.").

In considering the totality of the circumstances, Plaintiff has failed to state adequately that making a demand on the Board was futile, and Plaintiff has failed to state adequately that half the Board is substantially likely to be personally liable.

### 2. *Undifferentiated group of "Director Defendants"*

Plaintiff's complaint also fails because it lumps together the directors instead of directing specific allegations at specific individuals. Lumping together twenty-two "Director Defendants" who served on Cardinal Health's Board over the course of many years (Doc. 1 at ¶ 38), and summarily concluding that they all face a substantial likelihood

---

[16] *See also In re Bidz.com, Inc. Deriv. Litig.*, 773 F. Supp. 2d 844, 857 (C.D. Cal. 2011) (granting motion to dismiss because "[t]here is nothing suggesting that the Board was ever presented with the[] 'red flags,' and although there are conclusory allegations that the Board consciously disregarded the warnings, Plaintiffs' conclusion requires the Court to make a logical leap it cannot do in light of the requirement that Plaintiffs provide particularized factual allegations of, at the least, knowledge").

of liability (*Id*. at ¶ 119), is not what Rule 23 contemplates. While Plaintiff argues that he is not required to plead demand futility on a director-by-director basis, under Ohio law, "broad, conclusory allegations . . . against the directors as a group" does not excuse demand. *Davis v. DCB Fin. Corp.*, 259 F. Supp. 2d 664, 671 (S.D. Ohio 2003).[17] A derivative plaintiff must allege particularized facts as to each director, demonstrating why he or she is unable to consider a demand. *See, e.g., ITT Corp.*, 653 F. Supp. 2d at 460 ("whether the Directors face a substantial likelihood of liability must be determined on a director-by-director basis"). Moreover, here, because the vast majority of the current Board (eleven of twelve) is composed of outside directors, there is a heightened presumption that the Board could have considered a demand in good faith. *Drage*, 694 N.E.2d at *2 (recognizing heightened presumption that a board acted in good faith where a majority of board consists of outside directors).

### 3. *McCall, Pfizer, and Abbott*

Plaintiff analogizes the instant case to the *McCall*, *Pfizer*, and *Abbott* decisions, where courts have found that demand was excused. However, those cases are distinguishable from the present case.

In *McCall v. Scott*, 239 F.3d 808 (6th Cir. 2001), the shareholders alleged particularized facts that the board knew or recklessly disregarded widespread, systematic, long-term health care fraud. *Id.* at 813. Specifically, plaintiffs alleged particularized

---

[17] *See also ITT Corp. Derivative Litig.*, 653 F. Supp. 2d 453, 460 (S.D.N.Y. 2009) ("Plaintiffs' conflation of all the directors into a single entity is insufficient under Rule 23.1").

facts such as reports to the board's audit committee indicating improper reimbursement practices, reports to the entire board about the company's acquisition program, and the execution of search warrants by four federal agencies on the company's offices in Texas. *Id.* at 823, 824.

In *Abbott Labs. Derivative S'holders Litig.,* 325 F.3d 795 (7th Cir. 2001), plaintiffs alleged particularized facts demonstrating a "sustained and systemic failure" by the board to discharge its oversight responsibility in good faith in the face of data it had in its possession. *Id.* at 809. Specifically, the complaint alleged that the FDA sent specific communications regarding the company's noncompliance to the directors, there were ten meetings between the FDA and company representatives, including a director and senior officers, about the company's regulatory violations, and an extensive paper trail concerning regulatory violations. *Id.* at 808-809.

In *Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453 (S.D.N.Y. 2010), the plaintiffs' particularized allegations included a settlement in 2002 with the government resolving claims stemming from off-label marketing "that Pfizer's board would create and implement a compliance mechanism that would bring information about illegal marketing activities to the board's attention." *Id.* at 455. Another settlement with the government in 2004 that "required even more stringent steps to bring any such misconduct to the Board's attention." *Id.* at 456. Subsequently, a large number of reports were made to members of the board which included information about the number of

FDA violation notices and warning letters, and requirements that the company's chief compliance officer had to report allegations of misconduct directly to the board. *Id*. at 455, 456, 457, 460.

Conversely, in this instant case, the complaint does not state what information was given to the Board about non-compliance with the 2008 MOA and <u>there are no allegations of reports to the Board or any evidence of the Board's knowledge of any purported failure to comply with the MOA</u>.  A plaintiff must plead with specificity "which documents, which conversations, which employees, or which reports" show the supposed failure and the necessary intent to harm or reckless disregard, so as to substantiate the accusations of demand futility.  *Ferro I*, 2006 U.S. Dist. LEXIS 11608 at 6 (rejecting as insufficient under Ohio law demand-futility allegations that the board "failed to establish and maintain internal financial controls").  Additionally, <u>there are no allegations that the Board knew anything about the transactions with the four customers of the Lakeland distribution center that gave rise to the 2012 DEA allegations, or information about any alleged defect in the Company's regulatory compliance</u>.

In *Johnson & Johnson Derivative Litig.*, No. 10-2033, 2011 U.S. Dist. LEXIS 112292 (D.N.J. Sept. 29, 2011), the complaint alleged "red flags" in the form of FDA warning letters, an FDA report, state attorney general subpoenas, *qui tam* complaints, a criminal plea, a settlement agreement with the DOJ, and a DOJ subpoena.  *Id*. at 2. Plaintiff argued that the board's knowledge and intentional inaction could be inferred from those "red flags," but the court declined to do so.  Ultimately, the court concluded

that the complaint failed to allege the board's bad faith. *Id.* at 14 (rejecting as conclusory the allegation that the board "understood" that kickbacks were illegal); *id.* at 22 (finding that the complaint lacked allegations that the CEO/chairman, to whom the FDA sent a warning about the alleged kickback, "shared his knowledge with the Board," and without that, "the Court cannot conclude that the Board was ever aware of the FDA letters"). The complaint also alleged that manufacturing problems that led to recalls were "reported to the board" and that the CEO/chairman stated that "there were adverse events reported that we knew." *Id.* at 24. However, the court concluded that the fact that "J&J may have not responded appropriately, does not translate into a finding that the directors acted in bad faith and failed to properly discharge their duties." *Id.* at 26.

Similarly, this Court cannot infer what knowledge Cardinal Health's Board had as a result of the alleged "red flags." Ultimately, like in *Johnson & Johnson*, the complaint fails to allege the Board's bad faith. Therefore, because Plaintiff's failure to make a pre-suit demand is not excused, he lacks standing to maintain a derivative claim pursuant to Fed. R. Civ. P. 23.1.

### III.   CONCLUSION

Accordingly, for the reasons stated here, the Cardinal Health Defendants' motion to dismiss (Doc. 7) is **GRANTED**, and this civil action is **DISMISSED** for failure to satisfy the requirements of Federal Rule of Civil Procedure 23.1.

**IT IS SO ORDERED.**

Date:  October 23, 2012                                *s/ Timothy S. Black*
                                                       Timothy S. Black
                                                       United States District Judge